**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:17-cv-00123-MR-DLH**


| | |
|---|---|
| **ROBERT LOUIS GARY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **FACEBOOK, INC. and WAYNE** ) | |
| **HAWKINS,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |


**THIS MATTER** is before the Court on the Defendants' Motions for Summary Judgment [Docs. 59, 61].

## I.    PROCEDURAL BACKGROUND

The Plaintiff Robert Louis Gary initiated this action in the United States District Court for the Northern District of California on November 22, 2016, asserting claims of employment discrimination based on his race in violation of 42 U.S.C. § 1981.[1]  [Doc. 1].  The action was transferred to this Court on May 8, 2017.  [Doc. 34].

_____

[1] Robert Baron Duffy was also named as a Plaintiff in this civil action.  Mr. Duffy's claims were voluntarily dismissed with prejudice on June 13, 2017.  [Doc. 46].

The Plaintiff, who is African-American, alleges in his Complaint that he was denied a promotion and equal pay in whole or in part on the basis of his race.[2] [Id. at 17]. Specifically, the Plaintiff asserts that he was discriminated against when he was not promoted in the first quarter of 2014 ("Q1 2014") and instead was promoted later in the third quarter of 2014 ("Q3 2014"). He also alleges that, because of this delay in his promotion, his compensation has lagged compared to the compensation paid to other white employees who were more quickly promoted.

The Defendants Facebook, Inc. ("Facebook") and Wayne Hawkins ("Hawkins") move for summary judgment with respect to the Plaintiff's claims.[3] The Court held a hearing on these motions on July 6, 2018. Having been fully briefed and argued, these motions are now ripe for disposition.

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might

---

[2] The Plaintiff also asserted claims that he was subjected to a racially hostile work environment and that he was denied equal terms and conditions of employment in whole or in part on the basis of race; however, the Plaintiff has withdrawn such claims.

[3] The Plaintiff voluntarily dismissed his claims against a third defendant, James Swensen, on April 30, 2018. [Doc. 58].

affect the outcome of the case."  News and Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record or by showing that the adverse party cannot produce admissible evidence to support that fact.  Fed. R. Civ. P. 56(c)(1).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the court that a triable issue exists.  Id.  Finally, in considering a party's summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the non-moving party, and must draw all reasonable inferences in favor of the non-movant as well. Adams v. Trustees of Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III. FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff as the non-moving party, the following is a recitation of the relevant facts.

Facebook is a global technology company that provides a social networking service for users worldwide.  [Normandy Dec. at ¶ 3].  Facebook operates data centers that house the company's large computer storage systems, including the data center in Forest City, North Carolina, where the Plaintiff is employed.  [Id.; Gary Dep. at 30-31].  Defendant Hawkins is a white male who was formerly[4] the facilities manager at the Forest City data center.  [Hawkins Dep. at 11-12].

The Plaintiff began his tenure at Facebook as a contract Critical Facilities Technician through Siemens Corporation ("Siemens") in July 2012.  [Gary Dep. at 29].  Siemens' contract was overseen by Hawkins.  [Id. at 40].  The Plaintiff was eventually offered a position with Facebook as a Critical Facilities Technician (later called Critical Facilities Engineer or "CFE") at the Forest City facility.  As part of that transition process, the Plaintiff was

---

[4] Hawkins was removed from the Forest City site in July 2015 and was terminated from his employment in August 2015, after Facebook concluded that Hawkins had made offensive racial and sexual comments to some Facebook employees (but, notably, not to the Plaintiff).  [Edwards Dec. at ¶¶ 15, 18, 19; Hawkins Dep. at 40-41].

interviewed by, among others, Hawkins. [Id. at 33]. The Plaintiff accepted the position on October 28, 2012, and began his duties on November 12, 2012. [Id. at 36, 39].

The Plaintiff was brought in at an entry-level, or "IC1" level, position. [Gary Dep. at 39]. Each CFE at the Forest City data center is assigned to an IC (individual contributor) level based on the quality of his or her performance. [Normandy Dec. at ¶ 6]. A CFE is considered for promotion to the next highest IC level once he or she has succeeded at the existing level and consistently demonstrated the skills necessary to succeed at the higher level. Each employee's performance is assessed in semi-annual performance reports. [Id.]. As for employee compensation, Facebook's Compensation Department controls all pay decisions. [Singh Dec. at ¶ 7]. Managers in the Forest City data center do not set pay for other employees. [Id.]. Rather, the Compensation Department sets employee pay under a formula that considers numerous factors, including the employee's performance review rating, IC level, and existing pay. [Id.].

From November 2012 until February 2013, the Plaintiff worked the third shift, from 7:00 p.m. to 7:00 a.m., alternating between three and four days per week. [Gary Dep. at 41-42, 43]. Based upon his performance in the first and second quarter of 2013, the Plaintiff was assessed as "meet[ing] all

expectations" and was awarded a bonus. This performance assessment was signed by Hawkins. [Gary Dep. Ex. 4; Gary Dep. at 64-65]. In February 2013, the Plaintiff transitioned from third to first shift, and he remained in that position until June of 2013. [Gary Dep. at 44, 53]. In June 2013, the Plaintiff was asked to resume his position on third shift, and the Plaintiff accepted the arrangement, thereby entitling him to a shift differential raise. [Id. at 54]. Upon resuming third shift, the Plaintiff's supervisor and primary evaluator was Matt Hamrick. [Id. at 55]. The Plaintiff continued in his third shift position from June 2013 until June 2014 when Hamrick offered him another first shift position. [Gary Dep. at 55, 56].

The Plaintiff was initially on a list of IC1 employees to be promoted for the Q1 2014 performance review period based upon his work product during the second and third quarter of 2013. [Faccone Dep. at 49-50]. When that promotion list was sent to Facebook's headquarters in Menlo Park (MPK), MPK decided there were too many employees on the promotion list, thus requiring the Forest City managers to reevaluate those employees, including the Plaintiff. [Faccone Dep. at 49-51]. A group of several managers, including James Swensen, Wayne Hawkins, Matt Hamrick, Wesley Gordon, and James Faccone, therefore met to reevaluate the promotion decisions for Q1 2014. [Faccone Dep. at 37-38, 50]. The Plaintiff was one of the

employees the managers decided to take off the promotion list. [Faccone Dep. at 53].

The review of the Plaintiff's performance was led by Hawkins. Of the other managers present, Gordon did not have any input regarding the Plaintiff's performance as Gordon supervised CFEs in another building. [Hawkins Dep. at 40]. Faccone, as the global facilities manager, was responsible for evaluating the performances of all CFEs at the Forest City data center [Marciari Dec. at ¶ 8]; however, he admitted that he did not review any documents pertaining to the Plaintiff's performance prior to this meeting. [Faccone Dep. at 49]. As the Plaintiff's current supervisor, Hamrick offered some feedback and a peer summary review, which he completed in late 2013 shortly after he began supervising the Plaintiff. [Hamrick Dep. at 31-33, 122-23, 126-29]. While the group agreed that the Plaintiff was "trending towards promotion" [Hawkins Dep. at 110; Hamrick Dep. at 123], the group decided not to promote the Plaintiff to IC2 at that time [Hawkins Dep. at 84]. Thus, the Plaintiff was assessed in a Q1 2014 performance cycle letter as "meet[ing] all expectations" and was awarded a raise and a bonus. The performance review was signed by Hawkins. [Gary Dep. Ex. 5; Gary Dep. at 65-68].

After receiving the Q1 2014 performance review, the Plaintiff met with Hamrick to discuss why he received lower than expected compensation increases. Hamrick discussed the matter with him, but the Plaintiff was dissatisfied with Hamrick's explanation. [Gary Dep. at 68-71]. The Plaintiff then requested and was granted a second meeting with Hamrick to discuss the same topic, and was again dissatisfied with the outcome. [Gary Dep. at 72-73, 76-78, 79-81]. The Plaintiff then requested to meet with James Faccone, his global manager, who asked him if the Plaintiff thought that the differences in pay and promotion was due to race. The Plaintiff told him "no," because at the time none of the other individuals who were complaining about pay were black. [Gary Dep. at 85-91, 92-94]. Still unsatisfied, the Plaintiff then requested a meeting with Robert Baron Duffy, another Facebook supervisor, who only advised him to keep accurate records if he felt he was being wronged. [Gary Dep. at 81-84, 85].

On April 30, 2014, Hamrick scheduled a meeting where he, Hawkins, and the Plaintiff could discuss the Plaintiff's grievances. The Plaintiff requested that Duffy be allowed to attend due to Duffy also being African-American. [Gary Dep. at 116-17]. At that meeting, the Plaintiff confronted Hamrick and Hawkins with his concerns and was told by Hawkins that the disparity in pay stemmed from differences in the experience level between

the Plaintiff and other CFEs, as well as the Plaintiff's communication difficulties. [Gary Dep. at 120-21, 122-26]. The Plaintiff testified that Hawkins told him that another CFE, Greg Randall (who is white), exhibited more initiative, and Hamrick told him he needed to improve his communication. [Gary Dep. at 78-79].

On May 1, 2014, the Plaintiff submitted a written complaint to Facebook's Human Resources department. [Gary Dep. at 129; Gary Dep. Ex. 15]. Specifically, the Plaintiff alleged that Randall had received a promotion and pay raise during the Q1 2014 performance cycle while the Plaintiff had not, and that the disparity was due to the Plaintiff's race. [Id.].[5]

Immediately upon receiving the Plaintiff's complaint, Facebook investigated the Plaintiff's claims. [Marciari Dec. at ¶ 6]. Facebook's investigation team interviewed five employees, including the Plaintiff, analyzed performance evaluations and compensation data for the Plaintiff and Randall, and reviewed the total number of work tickets closed by each CFE in 2013. [Marciari Dec. at ¶ 7]. Facebook's lead investigator, Sandi

_____

[5] The Plaintiff asserts in his Declaration that, in making his complaint about pay disparity, he told Facebook's Human Resources investigator, Sandi Marciari, that he had heard Hawkins refer to another African-American employee as a monkey and that the Plaintiff had been told by another co-worker that Hawkins was going around the facility referring to that employee as a monkey. [Gary Dec. at ¶ 30]. The Plaintiff's written complaint to Human Resources, however, does not reflect this particular complaint. [See Gary Dep. Ex. 15].

Marciari, concluded that management's decision to promote Randall and not the Plaintiff was due to Randall's superior work performance and demonstrated initiative, not due to the Plaintiff's race. [Marciari Dec. at ¶¶ 24-26]. The investigator also learned that the Plaintiff's performance had improved and he was already scheduled for promotion in the next performance review cycle. [Marciari Dec. at ¶ 27]. Marciari conveyed the results of her investigation to the Plaintiff on May 29, 2014, and met with the Plaintiff one or two times thereafter. [Gary Dep. at 145, 147-48]. On June 8, 2014, the Plaintiff sent an email to Marciari stating that he could "respect [her] decision" that the failure to promote him was not discriminatory, but he continued to question the pay disparity between him and Randall. Gary Dec. Ex. E]. Thereafter, the Plaintiff took no further action to redress his concerns within Facebook prior to filing an EEOC charge. [Gary Dep. at 150].

In August 2014, the Plaintiff was promoted as scheduled to IC2, and his pay was raised accordingly. [Gary Dep. at 150-51]. Early in 2016, both the Plaintiff and Randall were promoted to the next level (IC3) and received the same pay rate. [Normandy Dec. at ¶ 9]. Randall and the Plaintiff currently are ranked at the same IC3 level, but the Plaintiff now earns more than Randall. [Id.]. The Plaintiff testified that he has agreed with each performance review he received after Q1 2014, and he has had no

complaints about his reviews, salary increases or promotions since then. [Gary Dep. at 150-52, 152-60; Gary Dep. Exs. 17-23].

The Plaintiff's pay and level were lower than Randall's pay and level for only six months -- from February to August 2014. [Normandy Dec. at ¶ 9]. When the Plaintiff was promoted to IC2 in August 2014, he received a pay increase to the same salary as Randall. [Id.]. Further, on December 17, 2015, Facebook paid the Plaintiff a lump sum equivalent to the difference between the Plaintiff's pay and Randall's pay before the Plaintiff was promoted to IC2. [Normandy Dec. at ¶ 12].

In July 2015, the Plaintiff read a statement from a fellow employee, Brian Gill, regarding various racially charged comments that Hawkins had made. [Gary Dep. at 172-73; Gary Dec. at ¶ 57]. From that statement, the Plaintiff learned that, at some unspecified time, Gill had heard Hawkins refer to the Plaintiff as a "lazy n****r that wants everything handed to him"; had heard Hawkins refer to Facebook employee Robert Duffy, who is African-American, as a "n****r"; and had heard Hawkins refer to Facebook employee Stencil Quarles, who is also African-American, as a monkey, asking "how can a monkey be allergic to f---ing bananas…" (Quarles is known to be

allergic to bananas).[6]  [Gary Dec. at ¶ 57].  The Plaintiff admittedly never heard any racial comments about him by Hawkins directly.  [Edwards Dec. at ¶ 17; Gary Dep. at 172-73].

On July 2, 2015, the Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  [Gary Dep. Ex. 24]. On July 31, 2017, the EEOC issued a right to sue letter to the Plaintiff.  [Gary Dep. Ex. 26; Gary Dep. at 168-70].  The Plaintiff presently remains an employee of Facebook at the Forest City data center.  [Gary Dep. at 150].

## IV.  DISCUSSION

Title 42 of the United States Code, Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  To that end, § 1981 extends to the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual

---

[6] Gill's 2015 statement referenced by the Plaintiff does not appear in the record.  There is, however, an affidavit from Gill dated July 14, 2016, in which Gill states that he heard Hawkins refer to Duffy as a "n****r" and to the Plaintiff as "a lazy n****r with his hand out" or "a lazy n****r always wanting something."  [Gill Aff. at ¶¶ 5, 6]. Gill's affidavit does not specify when these statements were allegedly made.

relationship." 42 U.S.C. § 1981(b); <u>Murrell v. Ocean Mecca Motel, Inc.</u>, 262 F.3d 253, 257 (4th Cir. 2001).

Generally, a § 1981 claim is treated the same as a Title VII claim. <u>See Guessous v. Fairview Prop. Invs</u>., LLC, 828 F.3d 208, 216 (4th Cir. 2016). Thus, a plaintiff asserting a § 1981 claim can survive summary judgment in one of two ways. First, the plaintiff can establish the claim "by demonstrating through direct or circumstantial evidence that his race was a motivating factor in the employer's adverse employment action." <u>Holland v. Washington Homes, Inc.</u>, 487 F.3d 208, 213 (4th Cir. 2007). Alternatively, the plaintiff can establish a claim by first "establishing a prima facie case of discrimination," using the familiar <u>McDonnell Douglas</u>[7] framework and then "demonstrat[ing] that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." <u>Id.</u> at 214 (citation omitted).

The Plaintiff concedes that there is no forecast of direct or circumstantial evidence of discrimination and that a prima facie showing of discrimination is therefore required in order to defeat summary judgment. Under the <u>McDonnell Douglas</u> framework, a plaintiff shows a prima facie

---

[7] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

case of race discrimination in the context of a failure to promote claim by demonstrating that (1) he is a member of a protected class; (2) he applied for a position; (3) he was qualified for that position; and (4) he was rejected for that position "under circumstances giving rise to an inference of unlawful discrimination." Bryant v. Aiken Reg'l Med. Centers Inc., 333 F.3d 536, 544-45 (4th Cir. 2003) (quoting Brown v. McLean, 159 F.3d 898, 902 (4th Cir.1998)). Once the plaintiff makes out this prima facie case, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Guessous, 828 F.3d at 216. Once the defendant shows such a reason, the burden then shifts back to the plaintiff to show that the stated reason is pretextual. Id.

Here, the Plaintiff has presented a forecast of evidence to establish that he is a member of a protected class and that he sought a promotion for which he was qualified. Thus, all that remains for the Plaintiff to establish a prima facie case is a showing that he was denied that promotion "under circumstances giving rise to an inference of unlawful discrimination." Bryant, 333 F.3d at 545. To satisfy this fourth element of the prima facie case, the Plaintiff relies on evidence that he was denied a promotion to IC2 at the same time that a similarly situated white employee, Randall, received a promotion and that a participant in the making of that decision had made racially

14

inappropriate remarks in other contexts regarding the Plaintiff and other African-American employees.

A plaintiff is not required to point to a similarly situated comparator in order to succeed on a discrimination claim. Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010). However, where a plaintiff chooses to base his discrimination claim on the more favorable treatment of similarly situated employees from a non-protected class, the plaintiff is required to show that he is similar to his comparator "in all relevant respects." Id. This means that a comparator "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

Here, the undisputed forecast of evidence shows that the Plaintiff's situation was similar to Randall's in some relevant respects, but not in all. At the time of the Q1 2014 promotions, Randall was already exhibiting many of the skills necessary for the IC2 level. According to Matt Hamrick, who managed both Randall and Gary at the time, Randall demonstrated initiative and significant hands-on experience in the same job. During the six months prior to the Q1 2014 promotions, Randall "worked with vendors, was very

busy around the facility, and was handling multiple situations." [Hamrick Dep. at 116]. According to Hamrick, Randall's "strength was verbal communication, holding vendors accountable, making sure things were passed on, and making sure the facility remained running at a very busy time." [Id. at 126-27]. Randall had strong interpersonal skills, and "he was upbeat, he was interactive, he was present, he was in the mix." [Id. at 125]. Randall's high level of engagement, initiative, and demonstrated leadership, in combination with his hands-on experience, made him a strong candidate for promotion to IC2 in Q1 2014. By contrast, Hamrick viewed the Plaintiff as lacking Randall's demonstrated initiative and strong interpersonal skills. [Id.]. The Plaintiff had failed to show initiative, even though Hamrick had explained to the Plaintiff the importance of going above and beyond what was required of his basic job responsibilities. [Marciari Dec. at ¶ 15]. For example, when the Plaintiff agreed to take on a special project of creating a numbering system, he struggled to stay on task, failed to provide complete information when requested, and did not stay motivated. [Id. at ¶ 17].

The Plaintiff attempts to counter this evidence by arguing that Hamrick's opinions regarding the Plaintiff's relative strengths and weaknesses were opinions simply fed to him by Hawkins. Specifically, the Plaintiff relies on Hamrick's statement in his deposition when Hamrick noted

that his perception of the Plaintiff's lack of interaction with vendors "came from what I was briefed on when I became [the Plaintiff's] manager." [Hamrick Dep. at 129]. Because Hawkins had demonstrated racial animus, the Plaintiff's argument goes, Hawkins' opinions regarding the Plaintiff's work performance were necessarily tainted with racial bias. By extension, the Plaintiff argues, *Hamrick*'s opinions were therefore necessarily tainted with racial bias as well, even though by that time Hamrick had been the Plaintiff's immediate supervisor for several months.

Even assuming for the sake of argument that Hawkins' negative opinion of the Plaintiff's work performance was racially motivated, the Plaintiff has failed to show that Hamrick's opinions about his work performance were based solely on Hawkins' reports. A careful reading of all of Hamrick's testimony makes clear that Hamrick formed his own opinions about the Plaintiff's performance after he began supervising the Plaintiff. Specifically, he testified that he started noticing the Plaintiff's performance relative to that of Randall's shortly after he began supervising the Plaintiff. [Hamrick Dep. at 124, 128]. He noted that the Plaintiff was "[l]acking communication, not necessarily the content of communication but not as much verbal or written communication; and he did what was required, but he wasn't doing anything that . . . was above and beyond." [Id. at 126].

In light of the demonstrated differences in their initiative and communication skills, the Plaintiff has failed to show that he and Randall were similarly situated at the time of the Q1 2014 promotion decisions.

In his opposition to the Defendants' motions for summary judgment, the Plaintiff relies on a new potential comparator, Kevin Walker, in an effort to meet his prima facie case. Walker, however, is not similarly situated to the Plaintiff for several reasons. Walker was hired in June 2013, following the completion of a three-month internship with Facebook. [Walker Dep. at 13, 20, 33]. This internship allowed Facebook managers to observe Walker's work ethic even prior to being formally hired. [Walker Dep. at 12-14, 21; Normandy Dec. at ¶ 14]. After Walker was hired as a full-time Facebook employee, Walker and the Plaintiff worked in different buildings and had different supervisors. [Walker Dep. at 48; 60; Gary Dep. at 41-46, 55-58]. Finally, Walker, unlike the Plaintiff, had been consistently rated as an exceptional employee, exhibiting outstanding work performance and earning Exceeds Expectations or Greatly Exceeds Expectations on every performance review since Q3 2014. [Normandy Dec. at ¶¶ 13-19]. Because of his "outstanding performance," Walker received a series of rapid promotions that "outpaced all other CFEs at the Forest City facility." [Id. at ¶ 13]. While a comparator is not required to be "an exact match," there still

must be "enough common features between the individuals to allow for a meaningful comparison." Haywood, 387 F. App'x at 359-60 (citation and internal quotation marks omitted). The Plaintiff has failed to demonstrate that a "meaningful comparison" can be made between his work performance and that of Walker's.

Having failed to show that either of his comparators were similarly situated, the Plaintiff cannot establish a prima facie case of discrimination with respect to Facebook's decision not to promote him in Q1 2014. Even if the Plaintiff could make out a prima facie case, however, Facebook has presented evidence that, during the Q1 2014 evaluation period, management believed that the Plaintiff was not ready for the IC2 promotion at that time, due to his lack of initiative and communication issues. "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). Accordingly, the burden shifts to the Plaintiff to demonstrate that Facebook's articulated reasons for not promoting the Plaintiff during Q1 2014 are pretextual.

In an effort to demonstrate pretext, the Plaintiff focuses on the involvement of Hawkins in the decision not to promote the Plaintiff in Q1

2014. Because Hawkins had exhibited animus toward African-Americans, the Plaintiff contends, his involvement in the decision not to promote the Plaintiff gives rise to an inference of unlawful discrimination. In so arguing, the Plaintiff particularly focuses on the combination of Hawkins referring to the Plaintiff by a racially derogatory term and calling him "lazy" because it reinforces a negative racial stereotype, and it is closely akin to Hawkins' supposed basis for denying the Plaintiff the promotion for "lacking initiative."

Setting aside the fact that the Plaintiff did not hear this statement directly from Hawkins but rather only second hand from another employee, this statement nevertheless fails to demonstrate pretext. There is no indication in the record when this alleged statement was made or, more importantly, that this alleged statement was made near the time of the promotion decision in Q1 2014. Even if it could be inferred that such statement was made at or near the time of the Q1 2014 promotion decision, however, Hawkins did not have the authority to control Facebook's promotion decisions. Rather, a selection panel -- including Facebook managers Swensen, Hawkins, Hamrick, Gordon, and Faccone -- collectively made the decision to remove the Plaintiff (and others) from the promotion list for Q1 2014. Other managers on this panel, particularly Hamrick, had input in the decision not to promote the Plaintiff and all were in agreement on the

reasons for not promoting the Plaintiff at that time. Thus, Hawkins' involvement in the selection panel does not demonstrate that the reasons given Facebook's decision not to promote the Plaintiff in Q1 2014 were pretextual.

Second, the Plaintiff attempts to show pretext by arguing that "Facebook has offered conflicting explanations for [the Plaintiff's] non-promotion" in Q1 2014. [Doc. 81 at 21]. A plaintiff may attempt to establish pretext "by showing that the employer's proffered explanation is unworthy of credence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)). The undisputed forecast of evidence, however, shows that the the explanations offered by Facebook management have been entirely consistent. The Plaintiff testified that Hawkins told him Randall exhibited more initiative, and Hamrick told him he needed to improve his communication. [Gary Dep. at 78-79]. The Plaintiff's Q1 2014 written evaluation states "in order to achieve the next level Robert will need to be more of a self starter and find projects on his own to improve the way in which things are done." [Doc. 79-29 at 2]. Hamrick and Hawkins both testified that the Plaintiff's lack of initiative and communication skills kept him from receiving a promotion. [Hawkins Dep. at 88-89; Hamrick Dep. at 126].

Despite the Plaintiff's protests to the contrary, Faccone's testimony was also consistent on this point. The Plaintiff's contention that "Faccone explained…[the Plaintiff] was selected to be taken off [the promotion list] after all the employees were revaluated for their 'technical abilities'" misconstrues his testimony. [Doc. 81 at 21]. In fact, Faccone testified that he "could not remember the specifics" of why the Plaintiff did not receive the promotion and that the selection panel "weighed a lot of different options, and I don't remember what those options were." [Faccone Dep. at 52-53]. Faccone later testified that someone reported to him that the Plaintiff "had some communication issues." [Faccone Dep. at 88]. Because Faccone's testimony does not contradict the reasons for Facebook's promotion decision in Q1 2014 given by the Facebook managers who remembered the specifics – namely, that the Plaintiff lacked initiative and communication skills -- it does not create a triable issue of fact. See Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006) (noting that minor discrepancies in an employer's rationale does not demonstrate pretext).

Finally, the Plaintiff attempts to demonstrate pretext by arguing that Facebook failed to follow its own criteria for promoting the Plaintiff, Randall, and others. This argument is primarily based on the Plaintiff's opinion that he was better qualified than the other candidates promoted. [See Gary Dec.

at ¶¶ 16-22].  The Plaintiff's subjective opinion regarding his qualifications and that of his co-workers, however, has little probative value.  "Plaintiff's perception of [his] own experience, performance, and skills is not relevant. It is the perception of the decision-maker that counts."  McDougal-Wilson v. Goodyear Tire and Rubber Co., 427 F. Supp. 2d 595, 607 (E.D.N.C. 2006). The Plaintiff's "unsubstantiated allegations and bald assertions concerning [his] qualifications and the shortcomings of [his] co-workers" are insufficient to establish pretext and survive summary judgment.  Evans, 80 F.3d at 960. It is Facebook's prerogative to determine what combination of training, qualities, and related experience best qualifies a candidate for promotion. See Hux, 451 F.3d at 315 ("[I]n a suit alleging failure to promote, a plaintiff seeking to rebut an employer's reliance on inferior job qualifications cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination.").

Having failed to establish pretext, the Plaintiff's claim of race discrimination based on a failure to promote must fail.  Accordingly, the Defendants' motions for summary judgment with respect to the Plaintiff's failure to promote claim are granted.

The Plaintiff's equal pay claim is inter-related with his failure to promote claim. Acknowledging that his compensation is necessarily tied to his IC level, the Plaintiff argues that Facebook's delay in promoting him to IC2 caused his compensation to lag behind that of other, white CFEs. The forecast of evidence before the Court, however, belies the Plaintiff's argument. The undisputed record shows that after the Plaintiff was promoted to IC2, he and Randall were paid the same salary. Additionally, both the Plaintiff and Randall were promoted to IC3 at the same time in Q1 2016, with the same rate of pay. Since then, the Plaintiff and Randall have continued to hold the same IC3 level, but the Plaintiff is paid slightly more than Randall. Moreover, Facebook has compensated the Plaintiff for the additional income he would have received had he been promoted to IC2 in Q1 2014 rather than in Q3 2014.

Notably, during his deposition, the Plaintiff did not challenge any other pay or promotion decisions following his Q1 2014 performance evaluation. The Plaintiff has continued to receive performance evaluations of either Meets All Expectations or Exceeds Expectations. He testified that he agreed with each performance review he received after Q1 2014, and he had no complaints about his reviews, salary increases, or promotions since that time. For all these reasons, the Plaintiff has failed to present a forecast of

evidence that he was denied equal pay in whole or in part because of his race. Accordingly, summary judgment in favor of the Defendants is warranted on this claim as well.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motions for Summary Judgment [Docs. 59, 61] are **GRANTED**, and this case is hereby **DISMISSED WITH PREJUDICE**.

A Judgment consistent with this Order will be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: July 25, 2018

Martin Reidinger
United States District Judge